# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2461-19T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.S.M. and A.H.B.,

     Defendants,

and

M.M.L.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF R.M.M.
and M.K.M., minors.

_____

Submitted December 14, 2020 – Decided January 14, 2021

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0099-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Kathleen Gallagher, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor R.M.M. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, of counsel and on the brief).

PER CURIAM

Defendant M.M.L. appeals from the Family Part's January 31, 2020 guardianship judgment, terminating his parental rights to his son, R.M.M. (Richard).[1] Judge Linda L. Cavanaugh entered the judgment for the reasons stated in her February 10, 2020 fifty-page opinion in which she concluded that plaintiff, the New Jersey Division of Child Protection and Permanency (Division) proved by clear and convincing evidence the four prongs of the best interest of the child test under N.J.S.A. 30:4C-15.19(a), warranting the

---

[1] To protect privacy interests and for ease of reading, this court uses initials and pseudonyms for the parties and the children.

termination of defendant's parental rights.[2]  On appeal, defendant contends that the Division failed to prove prongs three and four of the statutory test by clear and convincing evidence.  We find no merit to defendant's contentions and affirm substantially for the reasons stated by Judge Cavanaugh in her comprehensive written decision.

The evidence is outlined in detail in the judge's written decision.  A summary will suffice here.  Richard was born in 2013 to defendant and Sharon, his biological parents.  Richard has never been in defendant's custody, either individually, with Sharon, or anyone else.

In 2014, the Division received referrals stemming from Sharon's drug abuse and homelessness.  The Division substantiated Sharon for abuse and neglect, instituted a Title Nine (FN) action,[3] and took custody of Richard, which

---

[2]  The guardianship judgment also terminated the rights of Richard's mother, defendant S.S.M. (Sharon), as to Richard and as to Sharon's other son, M.K.M., whose father is defendant A.H.B., whose parental rights were also terminated. Neither Sharon nor A.H.B. appealed from the guardianship judgment or otherwise participated in this appeal.

[3]  N.J.S.A. 9:6-8.21 to -8.73.  Title Nine is designed to protect children who suffer "serious injury inflicted by other than accidental means." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 171 (1999) (quoting N.J.S.A. 9:6-8.8).  The protection afforded by the act extends to children whose parent's actions create a "substantial risk" of physical or emotional harm. Ibid. (quoting N.J.S.A. 9:6-8.21).  These actions are filed under a "FN" docket number.

A-2461-19T1

was approved by court order. At the time, defendant's location was unknown to Sharon and the Division. Later, defendant contacted the Division and after an October 2014 test, his paternity was confirmed. Thereafter, the Division dismissed the FN action, filed a guardianship action, and briefly reunited Richard with Sharon, before filing a new FN action and then this, its second guardianship action in 2019.

As documented throughout each litigation, defendant has a long-standing history of mental illness, substance abuse, unemployment, homelessness, arrests, and periods of incarcerations. According to defendant, as a child he was diagnosed with bipolar disorder, schizoaffective disorder, impulse control issues, and as an adult he was told he suffered from Post-Traumatic Stress Disorder (PTSD) and had been prescribed Risperidone. Also, as a twelve-year-old, he attempted to harm himself and suffered from auditory delusions.

Throughout his life, defendant had been hospitalized on numerous occasions due to his mental illnesses. For example, on one occasion, during a psychological evaluation, defendant admitted that he had significant anger issues. Those issues once caused him to have a fit during which he was physically violent, lost consciousness, and had to be hospitalized.

Due to his mental health issues, defendant could not secure and maintain stable housing. He consistently resided in shelters in New York, except when his mental health issues, as demonstrated by his aggressive behavior, caused him to be discharged from his housing programs or to otherwise become ineligible to remain in the program. During those periods, he was either homeless, living with other people in undisclosed locations, or he was incarcerated.

Throughout the litigations, defendant kept telling the Division that he was pursuing housing on his own through New York sponsored programs and that he was continuously on waiting lists for housing assignments. In 2016, he advised the Division that he had been approved for a rental subsidy from social services in New York, but had to locate an apartment, which he never did.

Because of his housing instability, it was difficult for the Division to locate defendant. Significantly, when the Division could not locate him, defendant made little effort to stay in contact with the Division about his son or to attend visits with him.

At one point, when the Division was able to contact a shelter where defendant was engaged in a program, it was told by a representative there that defendant had attended a program as a condition to his housing, but he refused to engage in any treatment for his mental illnesses. Consistent with that

A-2461-19T1

representation, defendant stated to Division representatives that while he had been prescribed medication to address his psychiatric issues, he refused to take the pills because he was able to regulate himself.

During the course of each litigation, when the Division was able to locate and communicate with defendant, it provided him with assistance and referred him to services, all directed towards his being able to overcome the issues that prevented him from caring even for himself. Specifically, the Division arranged for visits with Richard and provided defendant with bus passes so he could attend. His visits were at best sporadic, but when he attended his behavior toward his son was appropriate and affectionate. As to his failure to attend visits, defendant asserted that the visitation location was too far from the site where the bus from New York left him for defendant to be able to get to the location. When he did attend, at times his behavior towards others was aggressive and on one occasion caused Sharon to refuse to supervise visits, and in 2019, led to the suspension of his visits when his aggression was directed toward Division workers.

The Division also repeatedly referred defendant for substance abuse evaluations and treatment, including outpatient programs, and psychological and psychiatric evaluations. Defendant either did not attend the programs or

6

appeared only for the intake without ever returning. Because defendant admitted to regularly using marijuana and "K2," a cannabinoid (synthetic marijuana), the Division's referrals included treatment at MICA (Mental Illness Chemical Abuse) programs that could address both his mental illness and substance abuse. Similarly, defendant was referred to anger management programs and individual counseling.

The need for these services were discussed with defendant at family team meetings defendant attended. In response, he would commit to following through, but rarely, if ever did he do so, and although at times defendant advised the Division that he was in a MICA program, he never provided any proof that he completed any program or that he ever actually attended them.

In the first instance in which defendant eventually complied with a required psychological evaluation, defendant disclosed that his childhood experiences included being a victim of physical and sexual abuse in foster care, and as an adult, a history of arrests for drug offenses and theft. He stated that he served one state prison term and had also engaged in domestic violence with Sharon.

The psychologist determined defendant suffered from a severe mental disorder, and his psychological profile suggested "highly variable and

7

unpredictable moods, an embittered and resentful irritability, an untrusting and pessimistic outlook, and feelings of being cheated, misunderstood, and unappreciated." The psychologist concluded that defendant suffered from a "constellation" of psychological disorders and that he did not demonstrate an understanding of these issues or have "sufficient insight to comprehend the impact of this condition on his ability to parent his child." The psychologist recommended "skills training, psychological intervention, psychopharmaceutical treatment and monitoring, monitoring and treatment of substance abuse."

After the Division filed this guardianship action in February 2019, defendant underwent another psychological evaluation and a bonding evaluation conducted by the Division's expert, Mark Singer, Ed.D., a licensed psychologist, who was the only expert to testify at the guardianship trial later that year. The Division also called as witnesses two Division employees, Latoya Williams-Little, and Adrienne Caldwell. Neither defendant nor any other party testified or called any witnesses on their behalf.

Williams-Little, a family service specialist and the case worker for the family beginning in February 2019, explained the history of the Division involvement with the family. As to defendant, she described the services offered

to him dating back to 2015 and his failure to successfully participate, if at all, in any of those services. She also explained that the guardianship action was filed when it became apparent that "none of the parents were viable options at that time to take care of the children."

When asked about her concerns with defendant as a parent, Williams-Little explained that throughout the years of litigation, defendant was never able to obtain stable housing, he admitted to using substances, and he had mental health issues for which he refused to take medication to remedy. Also, as to defendant's visitation, she explained that since her involvement with the case in February 2019, defendant had seen Richard "maybe three times," even though the Division offered him transportation assistance, which he refused to accept. In her opinion, he had not remedied the harm or risk of harm to Richard.

As a result of the filing, the Division assessed Richard's previous resource home and relatives identified by Sharon for his adoption. Defendant did not provide the Division with any of his family members that it should have investigated for placement of his son. None of Sharon's relatives or the resource family were, at that time, in a position to adopt, having been ruled out by the Division, or not willing to do so.

Williams-Little also explained that Richard and his half-brother were doing well in their resource home. However, she also stated that at that time, the current resource parent was not committed to adoption.

When Caldwell testified, she explained that she worked as an adoption supervisor for the Division and had been involved with the family since 2015. She also testified about the likelihood that Richard and his brother would be adopted if their parents' rights were terminated. According to Caldwell, although at that moment the Division did not have an identified family willing to adopt the boys, she believed that once they were freed for adoption it would not be difficult to find them a home based upon their age and positive qualities.

Dr. Singer testified about the results of his June 17, 2019 psychological evaluation of defendant and his bonding evaluation, which were set forth in his July 15, 2019 report. Prior to completing this report, Dr. Singer reviewed a substance abuse evaluation of defendant.

Dr. Singer explained that during the psychological evaluation, defendant was cooperative, presented physically with "very heavily soiled clothing" and had "very strong body odor coming from him," which he attributed to defendant being "homeless since 2007," unemployed, and sustaining himself only through food from soup kitchens and other agencies. As to defendant's background, the

10

doctor explained that defendant had an "unfortunate childhood," having been in approximately twenty foster homes, and that he had been a victim of abuse when he was younger. Also, he noted that defendant had been arrested over ten times, most recently in October 2018.

Turning to defendant's history of mental health issues, the doctor stated that defendant reported he heard voices in his head at the age of twelve telling him to run away, and that he had been diagnosed with bipolar disorder, post-traumatic stress disorder, and schizoaffective disorder. According to Dr. Singer, defendant acknowledged that "he gets angry and when he gets angry[,] he explodes and sometimes he has blackouts as a result of that anger." The doctor also observed that defendant had been hospitalized several times for mental health issues, most recently in 2016, yet defendant did not take any medication prescribed to him to address his problems.

As to defendant's substance abuse, Dr. Singer explained that defendant "acknowledge[d] that he had used substances in the past, but he had been sober for a significant point in time." During the evaluation, defendant told Dr. Singer that he did not use drugs and had no current substance abuse treatment. However, according to the June 2019 substance abuse report that Dr. Singer reviewed, it was recommended that defendant enroll in a MICA program as

11

defendant suffered from a substance abuse disorder for K-2, which was contrary to defendant's representations. Dr. Singer believed defendant's refusal to take needed medication or engage in recommended programs demonstrated a pattern of behavior that defendant would continue over time.

Dr. Singer also explained that based on the results of the personality assessments he conducted, defendant had an inflated self-esteem, could be verbally aggressive, and experienced delusions. The assessment also demonstrated defendant had a "history of engaging in intense and unstable relationships, which is consistent with the self-report information both from [defendant] and [Sharon] that their relationship was just about sex." It also suggested he had a "conduct disorder" earlier in life, which was consistent with his self-reported criminal history.

Based on his evaluation, Dr. Singer was concerned because defendant was "likely to have difficulty complying with limits placed on his behavior." Additionally, the fact defendant had delusions was concerning because "[w]hen people who have histories of delusional activity experience increased stress, there's an increased risk of delusions occurring." Dr. Singer also noted this meant defendant's ability to function within the "social world or within reality" could be compromised. These findings explained defendant's "desire in a

12

positive way to care for a child, when in reality, unfortunately, the data does not suggest that he is likely to be able to care for a child." Further, defendant's history of "intensive unstable relationships" raised concerns about his ability to create and maintain appropriate stability "in his own life, never mind the life of his child."

Addressing defendant's parenting skills, Dr. Singer found it significant that defendant "really had no plan regarding parenting, no understanding of discipline." Additionally, the doctor explained that defendant "lacks an understanding of alternatives to the use of corporal punishment." He found defendant lacked "nurturing skills" and that there was a chance "he may not be able to withstand the stress of parenting." Dr. Singer added, "[k]eep in mind, out of fairness to [defendant] he's never lived with [Richard]." Dr. Singer concluded that "[u]nfortunately, [defendant] was not a viable parenting option" for Richard and that defendant was not likely to become an option in the foreseeable future either based upon "the totality of data," defendant would likely continue to struggle with his mental health and substance abuse issues.

Dr. Singer also testified about the one-hour bonding evaluation he conducted with defendant and Richard. The doctor explained that defendant was "very appropriate" during the evaluation, hugging his child and otherwise

13

being appropriately affectionate, and when needed defendant provided appropriate structure. Dr. Singer added that Richard referred to defendant as "Daddy," and that they played appropriately, maintained appropriate eye contact, and "[a]ll in all" it was a positive interaction. Dr. Singer also described his interview with Richard and that "[a] lot of it focused on his behavior and being bad and wanting to hit."

Dr. Singer found that Richard "has developed a relationship with [defendant] where he sees [him] as being someone who is significant in his life." The doctor believed it was a positive relationship, but as compared to Richard's relationship with Sharon, "it's less intense or less deep." He further opined that Richard looked to his parents as "being significant play figures" in his life. Regarding bonding, he explained "[u]nfortunately, the case history dictates that neither [defendant] nor [Sharon] have been the accessible and responsive parental figures."

Dr. Singer believed that Richard would have a negative reaction to losing the familiar figures in his life. But he noted, "[a]t the same time, that negative reaction could likely be mitigated through offering this child permanency and I don't anticipate this child would experience significant and enduring harm." He recommended that to mitigate the harm Richard and his half-brother needed a

"loving and stable" environment. When asked about whether defendant could provide that for the children, Dr. Singer stated "I always have hope" but added that "[t]he data does not suggest that he'd be likely to do that in the foreseeable future."

After Dr. Singer testified the Division rested. As noted, defendant did not call any witnesses, nor did he offer any other evidence to rebut the Division's proofs. Despite having rested, the Division asked the judge to adjourn the matter for approximately two months so that it could re-open its case and recall Williams-Little to testify at that time as to anticipated developments in Richard's placement with a prospective adoptive home. Defendant did not object to the request and the judge granted it, continuing the matter to January 8, 2020.

When the matter resumed, Williams-Little testified, without any objection by defendant, and explained how a resource family who cared for Richard and his half-brother while their primary resource family travelled out of the country, immediately expressed a desire to adopt the children. After giving the original family a chance to express interest in adoption, they decided not to, so the Division moved forward with plans for the new resource family to adopt. The children were left in that home and integrated into the family, the house, and local school. The family and the children were excited about the prospect of the

adoption. She also explained the children's new family and environment had a positive impact on the children.

On January 31, 2020, Judge Cavanaugh entered the guardianship judgment, terminating defendant's parental rights to Richard. That same day, she placed her reasons on the record, which she later memorialized in her February 10, 2020 written decision.

In her comprehensive and thoughtful decision, Judge Cavanaugh made detailed credibility determinations and findings of facts, identified the controlling legal principles, and concluded that the Division had proven all four prongs of the best interests test, N.J.S.A. 30:4C-15.1(a), and that termination of defendant's parental rights was in the child's best interests.

In applying the statutory best interests test, Judge Cavanaugh explained in detail why she found that the Division met its burden as to the first two prongs of the test before addressing the third and fourth prongs. As to prong three, she found that the Division tried to work with defendant by providing referrals for substance abuse and psychological evaluations and treatment. She added that transportation was also provided to defendant to help him get to New Jersey from New York to facilitate visitation. Despite those referrals, Judge Cavanaugh concluded defendant did not "active[ly] participat[e] in the

16

reunification process."  Moreover, relying upon Dr. Singer's "uncontroverted and consistent" testimony, the judge also concluded that defendant was not "able or willing to overcome or remove the harm facing [Richard]."

The judge also found that the Division explored alternatives to termination of parental rights and concluded that there were no alternatives after assessing and ruling out Sharon's father, brother, and mentor.[4]  The judge concluded that the Division proved by clear and convincing evidence that the third prong had been met.

Finally, Judge Cavanaugh addressed the fourth prong—that the termination will not do more harm than good—and concluded that the Division proved this prong as well by clear and convincing evidence.  The judge reiterated defendant's "history of mental illness, substance abuse, lack of compliance with medication, unstable housing, anger issues, incarcerations, and again, very importantly, [he] has had inconsistent and sporadic visitations with the child; a child who knows him and calls him daddy."  She also found Dr. Singer's comments regarding this relationship "very significant."

---

[4]  The judge evidently misspoke when she identified the relatives as being defendant's relatives.  There was no evidence that defendant came forward with any possible placements for Richard.  According to Williams-Little's testimony, the Division assessed Sharon's family members and a mentor of hers.

The judge explained that when Dr. Singer did the evaluations, there was no prospective adoptive home, but during his testimony, he "still opined that even with no adoptive parent for the boys, he felt their eventual adoption would likely be enough to mitigate any negative reaction to the termination of their parental rights." Further, she explained that Dr. Singer found Richard's relationship with his parents had already been disrupted because of his parents' own behavior, and it was in the best interest of Richard to terminate parental rights.

The judge also addressed Caldwell's testimony that in her experience working with select home adoption, "she thought it was likely that an adoptive home for [Sharon's] two children could be located once they were legally freed." Ultimately, the judge reiterated Dr. Singer's conclusion that defendant is "not [a] viable parenting optio[n] now and will not be [a] viable parenting optio[n] in the foreseeable future." She added, "[t]hese conclusions are unassailable as there is no evidence in the record that would support any other conclusion," especially since defendant had never provided attention or concern to his son. Further, there was no evidence that suggested this would change now or at any time in the future.

Finally, the judge found that Richard was now in a "stable, secure home, where [he] seem[ed] to be thriving," which "further support[ed] the [judge's] conclusion." She then concluded that the Division satisfied prong four by clear and convincing evidence. This appeal followed.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's fact findings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "[T]he trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245 (2012).

On appeal, defendant challenges only Judge Cavanaugh's determination that the Division satisfied the third and fourth prongs of the statutory test. Specifically, he argues the Division failed "to prove by clear and convincing evidence that" it provided defendant with sufficient services "to help him correct the circumstances that led to" his son's placement with a resource family. He contends the Division's efforts at reunification focused on Sharon and "largely ignored" him, even after the first attempt at reunification with Sharon failed, and to the extent the Division provided services, they were not tailored to his needs and the Division failed to help him to attend visits with his son.

In addition, defendant argues prong four was not met because the Division failed to provide sufficient evidence to show that terminating his parental rights would not do more harm than good. Defendant highlights that at the conclusion of trial, Richard was not in an adoptive home and argues, "thus, there was no compensating benefit, such as adoption, to [Richard] should his father's rights be terminated at that point." He also argues that the Division's reliance on hearsay evidence to establish the anticipated adopting parent's commitment to adopting the children "should have been rejected by the trial court as not meeting the high evidentiary standard required in termination proceedings." We find no merit to these contentions.

Under prong three, the Division must show it has "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home . . . ." N.J.S.A. 30:4C-15.1(a)(3). The Division's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. In re Guardianship of D.M.H., 161 N.J. 365, 390 (1999). N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts . . . by [the Division] to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure . . . ." The statute sets forth examples of "reasonable efforts," including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

Under the fourth prong, the Division must prove by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good."

N.J.S.A. 30:4C-15.1(a)(4). "To determine whether the comparative harm is proscribed by the fourth prong in a case involving a child in foster care . . . the court must inquire into the child's relationship both with her biological parents and her foster parents." In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999). In order to satisfy the fourth prong, the Division "should offer 'testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship' with the natural parents and the foster parents." R.G., 217 N.J. at 559 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)). Under this prong, "[t]he question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008).

"It has been 'suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 610 (1986)) (alterations in original). But equally true is that "[i]t is . . . against a child's best interests to prolong permanent placement because the natural parent

22

is unable to care for the child for a protracted period." N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 371 (App. Div. 2014); A.W., 103 N.J. at 611.

"[G]iven the need for continuity, the child's sense of time, and the limits of our ability to make long-term predictions, [the best interests of the child] are more realistically expressed as the least harmful or least detrimental alternative." Id. at 616. Although there may be a "natural tendency to want to continue working with parents to restore the family unit," a court "must not lose sight of time from the perspective of the child's needs," and must keep in mind the State's "strong public policy in favor of permanency." K.H.O., 161 N.J. at 357.

The core goal of all guardianship litigation is the child's need for permanency and stability. Ibid. In addressing prong four, "courts must consider the child's age, [his] overall health and development, and the realistic likelihood that the parent will be capable of caring for the child in the near future." Ibid. (emphasis added).

After carefully reviewing the record in light of these legal principles, we conclude that substantial credible evidence supports Judge Cavanaugh's thorough and well-reasoned decision. There is no basis for us to disturb her

A-2461-19T1

determination that the Division satisfied each of the statutory prongs by clear and convincing evidence and that termination of defendant's parental rights was warranted. We add only the following comments.

As to defendant's claim that the Division did not assist him with housing, or provided him with tailored services, the Supreme Court has observed "[w]hether particular services are necessary . . . must . . . be decided with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort." D.M.H., 161 N.J. at 390. Here, the record supports Judge Cavanaugh's finding that defendant refused to participate in the reunification process that required he take action to address his mental health and substance abuse issues, which caused his inability to care for himself, let alone being a safe caregiver to his young son.

Moreover, because defendant could not provide any stability or safety to his child, it was not unreasonable for the Division to focus its efforts on Sharon, even though the reunification unfortunately failed, as she was Richard's only parent that ever lived with and provided for him for a substantial period of time. Sharon was also the only parent that ever complied for a significant period or showed the potential to comply, and who stayed in contact with the Division.

A-2461-19T1

The Division's focus on the primary caregiver was appropriate. See R.G., 217 N.J. at 562.

Defendant's argument as to the fourth prong is equally unpersuasive. The judge's finding was supported by Dr. Singer's unrebutted testimony that despite the fact that Richard had not been placed at the time in a prospective adoptive home, termination would not do more harm than good, because Richard had no parent capable of providing for his safety and care, now or in the foreseeable future. In any event, defendant's contention was quickly undermined when Richard was placed in a prospective adoptive home in which he was thriving.

Judge Cavanaugh's decision here upheld our public policy that, "[a] child cannot be held prisoner of the rights of others, even those of [the] parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). "Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 484 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001)).

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION